ORIGINAL

# FILED EX PARTE & UNDER SEAL

FILED-USDC-NDTX-DA '26 AUG 14 PM3:40

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS FORT WORTH DIVISION

UNITED STATES OF AMERICA; STATE OF FLORIDA; and STATE OF INDIANA; *ex rel.* AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiffs*,

v.

DELOITTE LLP; DELOITTE CONSULTING LLP; DELOITTE & TOUCHE LLP; DELOITTE FINANCIAL ADVISORY SERVICES LLP; and DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP,

*Defendants*.

Case No. 4:25-cv-00458-O
*SEALED*

SEALED

## SECOND AMENDED COMPLAINT[1]

The American Alliance for Equal Rights brings this action against Deloitte LLP and its subsidiaries under the False Claims Act and two state-law equivalents. The Alliance seeks declaratory relief, treble damages, and civil penalties under applicable law.

1. "'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *SFFA v. Harvard*, 600 U.S. 181, 208 (2023) (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Such classifications are odious because "'it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities.'" *Id.* at 220. In short, "racial discrimination is invidious in all contexts." *Id.* at 214 (cleaned up).

[1] All parties to this proceeding, including Relator, the United States, Florida, Indiana, and all Defendants consent to the filing of this second amended complaint. *See* Fed. R. Civ. P. 15(a)(2).

**FILED EX PARTE & UNDER SEAL**

2. Race-based discrimination is no less invidious when the discriminator is a government contractor. It is especially pernicious because government contracts are paid out of the public fisc, and government contractors are a reflection of the public officials who hire them. This close association means that discriminatory contractors uniquely undermine "our Nation's understanding that [racial] classifications ultimately have a destructive impact on the individual and our society" and corrode public faith in the principle of racial equality that our forefathers "[p]urchased at the price of immeasurable human suffering." *Adarand Constructors v. Pena*, 515 U.S. 200, 240 (1995).

3. Recognizing this problem, the political branches have long identified discriminatory contracting practices as an evil to be eliminated. Government contractors are subject to federal civil-rights laws prohibiting racial discrimination. *E.g.*, 42 U.S.C. §2000e-2; §1981. And the executive branch has long made contractors agree to a nondiscrimination clause as a condition of participating in the federal procurement process. *See* Exec. Order No. 11246, *Equal Employment Opportunity*, 30 Fed. Reg. 12319-25 (Sept. 28, 1965); 41 C.F.R. §60-1.4 (requiring equal opportunity clauses in federal contracts); FAR 22.802, 22.810, 52.222-26 (Jan. 17, 2025) (implementing Exec. Order No. 11246 and 41 C.F.R. §60-1.4 in the Federal Acquisition Regulations).

4. Many States have followed suit, adopting standard nondiscrimination clauses that require contractors to comply with state and federal civil-rights law as a condition of their contracts. *See, e.g.*, Ind. Code §§5-16-6-1, 22-9-1-10, 36-1-12-15 (requiring a nondiscrimination clause stipulating that illegal discrimination qualifies as a material breach of the contract); *cf.* Fla. Stat. §287.134 (requiring the Department of Management Services to maintain a

**FILED EX PARTE & UNDER SEAL**

"discriminatory vendor list" of entities "disqualified from the public contracting and purchasing process" for violating their nondiscrimination obligations).

5. Additional nondiscrimination obligations attach if the contractor receives "federal financial assistance" under Title VI, 42 U.S.C. §2000d, *et seq.*, or operates in a highly regulated industry, *see, e.g.*, 47 U.S.C. §1754 (requiring the FCC to adopt "digital discrimination" rules for broadband internet providers). In practice, this means government contracts will often include multiple layers of reinforcing nondiscrimination requirements. For example, because Defendants help States that receive federal financial assistance administer federally funded programs like Medicaid, they must agree to comply with Title VI as a condition of those contracts.

6. These interlocking regimes mean that, whenever a private entity signs a contract with the government, the contractor must promise (often more than once) to comply with all applicable state and federal civil-rights laws, including laws like Title VII that prohibit racial discrimination in employment. In sum, government contractors simply cannot discriminate.

7. So too for Deloitte, one of the world's largest government contractors. In FY2024, the Deloitte network reported $67.2 billion in global revenue, roughly half of which was earned in the United States. Government contracts made up a third of that domestic figure, with U.S. affiliates collecting billions from federal contracts alone.

8. State, federal, or both, Deloitte's contracts almost uniformly include a nondiscrimination clause requiring equal opportunity in employment. But contrary to its promises and public statements, Deloitte's U.S. affiliates have engaged in a years-long campaign of illegal racial discrimination.

**FILED EX PARTE & UNDER SEAL**

9. Deloitte hid the nature and extent of its web of discriminatory practices from public view. But one of the Alliance's members—a former high-ranking employee of Deloitte—has personal knowledge, internal documents, and confidential communications demonstrating Deloitte's duplicity. The allegations in this complaint come from those inside sources.

10. In a deeply misguided effort to achieve "1-to-1" racial "parity" throughout the company, Deloitte has implemented a host of discriminatory programs that flout state and federal civil-rights laws. Among other things, these programs entail hosting segregated professional-development programs, developing a parallel promotion track available only to minorities, and embracing a facially discriminatory recruiting initiative that committed the company to hiring a discrete number of black applicants. When that last program purportedly underwent a public makeover to refocus on race-neutral skills, Deloitte secretly doubled down on its original discriminatory goals in private. And throughout, leaders at the highest level of Deloitte's consulting practice have pushed subordinates to employ sub-silentio racial quotas in weekly meetings—making race a factor in everything from internal awards, to hiring and promotion decisions, to usage rates among the firm's consultants.

11. High-ranking officials at Deloitte knew that these discriminatory practices were illegal. For example, the Chief Operating Officer of a component of Deloitte's government contracting practice with 3,000 employees and almost $1 billion in revenue admitted in an "off the record" conversation that Deloitte engaged in "intentional targeting of gender and race" for "awards" and "positions" and that there was "a population of people" (i.e., white males) who were being "affected" (or to use his "strong word," "being discriminated against"). The

**FILED EX PARTE & UNDER SEAL**

official even grudgingly acknowledged that the only way to achieve Deloitte's goal ("1-to-1 Parity" in all observable metrics) was to engage in intentional discrimination. But because leadership thought that was doing the "equitable" thing, it stifled dissent and encouraged subordinates to go along to get along for the sake of racial "equity."

12. Deloitte's leadership also had a powerful commercial incentive to keep quiet. Everyone at the company knew that the issue was "sensitiv[e]" because, if the details of its discriminatory practices became public, state and federal governments would enforce the nondiscrimination clauses in Deloitte's public-sector contracts. No government, after all, would continue to do business with an open and notorious discriminator.

13. Perhaps the locus of Deloitte's campaign of racial discrimination is Deloitte University—headquartered here in Tarrant County. The University is Deloitte's centralized training and professional-development hub in the United States. From interns to new hires to more senior employees heading into a competitive promotion cycle, almost every Deloitte employee will undergo training at Deloitte University at least once during their time with the company. That site hosts a series of segregated summits, conferences, and other events where participation is restricted to employees of certain racial groups. These fully funded annual events cut across different operating units and serve as centerpieces of Deloitte's annual DEI calendar. Minority employees who are allowed to attend and benefit from these events gain access to special opportunities and often find themselves on the fast track to advancement and promotion. And if problems arise, they can rely on the networks that these events built to right the ship.

**FILED EX PARTE & UNDER SEAL**

14. Deloitte University is the first place where employees' careers at the company diverge based on the color of their skin. Racial minorities are placed on one track, showered with exclusive career-development opportunities and benefits. Everyone else, but especially white males, are placed on another, with all the same zero-sum competition but none of the opportunities or benefits. Deloitte University also serves as an incubator for the company's overarching commitment to illegal DEI practices, with much of its programming dedicated to developing and normalizing a program of discrimination against white males.

15. In sum, despite its reputation as a prominent government contractor, Deloitte has failed to satisfy its most basic contractual obligation: maintaining its status as an equal opportunity employer. And by concealing the fact that its multi-billion-dollar government contracting business was rife with illegal discrimination, Deloitte perpetuated a massive fraud on the public fisc. That fraud violated the False Claims Act and at least two state equivalents.

16. "Eliminating racial discrimination means eliminating all of it." *Harvard*, 600 U.S. at 206. And "all of it" includes racial discrimination in government contracting. Deloitte is liable under the False Claims Act and the equivalent laws of Florida and Indiana.

## PARTIES

17. The real parties in interest to the claims in this action are the United States of America, Florida, and Indiana. *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009).

18. The American Alliance for Equal Rights is a nationwide membership organization that is dedicated to ending racial classifications and racial preferences in America.

**FILED EX PARTE & UNDER SEAL**

19. A Texas nonprofit, the Alliance was founded in 2021. It was approved by the IRS as a 501(c)(3) tax-exempt organization the same year. Edward Blum is the Alliance's president; Wai Wah Chin is its secretary; and Jay Bergman is its director.

20. The Alliance has more than 280 members, and its membership continues to grow. The Alliance's members are actively involved in the organization and its affairs. Members voluntarily join the Alliance. They pay dues. They receive regular updates. And they offer input on the Alliance's litigation and other activities.

21. One of the Alliance's members, Member A, is a former senior employee at Deloitte. Member A has personal knowledge of Deloitte's discriminatory practices and nonpublic documents proving the practices and Deloitte's knowledge that those practices were illegal.

22. Defendant Deloitte LLP ("Deloitte") coordinates and controls the operations of several U.S. subsidiaries, including Defendants Deloitte Consulting LLP, Deloitte & Touche LLP, Deloitte Financial Advisory Services LLP, and Deloitte Transactions and Business Analytics LLP. Deloitte's subsidiaries perform professional services for clients, including the federal government and Florida and Indiana. In 2024, Deloitte reported $33 billion in annual domestic revenue.

23. Defendant Deloitte Consulting provides consulting services to clients, including state governments and the United States. In 2024, Deloitte Consulting accounted for ~54.2% of Deloitte's overall revenue—over $17 billion.

# FILED EX PARTE & UNDER SEAL

24. Defendant Deloitte & Touche provides audit and assurance services to clients, including state governments and the United States. In 2024, Deloitte & Touche accounted for ~27.4% of Deloitte's overall revenue—over $9 billion.

25. Defendant Deloitte Financial Advisory Services provides a variety of risk management and financial advisory services to clients, including state governments and the United States. Deloitte Financial Advisory Services provides such services to Indiana through another subsidiary, Defendant Deloitte Transactions and Business Analytics. In 2024, Deloitte Financial Advisory Services accounted for ~2.7% of Deloitte's overall revenue—just under $1 billion.

## JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because claims under the False Claims Act "arise under the … laws … of the United States."

27. This Court has supplemental jurisdiction over the Alliance's state-law claims because those claims arise out of the same illegal discrimination and thus "form part of the same case or controversy." 28 U.S.C. §1367(a); *see also* 31 U.S.C. §3732(b) (providing that district courts "shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence" as a False Claims Act suit).

28. Venue is proper under 31 U.S.C. §3732(a) because Deloitte "transacts business" within this district through, for example, its operation of "Deloitte University," a large facility in Tarrant County located at 2501 Westlake Parkway, Westlake, TX 76262. Deloitte also maintains a commercial office located at 301 Commerce Street, Suite 2601, Fort Worth, TX

**FILED EX PARTE & UNDER SEAL**

76102. Alternatively, venue is proper under 28 U.S.C. §1391 because "a substantial part of the events" underlying the Alliance's claims occurred here.

## LEGAL BACKGROUND

### I. The False Claims Act and its state equivalents

32. The Alliance asserts claims under the federal False Claims Act, 31 U.S.C. §3729, the Florida False Claims Act, Fla. Stat. §68.082, and the Indiana False Claims and Whistleblower Protection Act and Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§5-11-5.5-1, *et seq.*, 5-11-5.7-1, *et seq.*

#### A. The False Claims Act

33. The False Claims Act, 31 U.S.C. §§3729-33, "covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 734 (10th Cir. 2018) (cleaned up).

34. The Act imposes civil liability on any person who, among other things: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," or (3) "conspires to commit a violation" of the Act. 31 U.S.C. §3729(a)(1)(A)-(C).

35. A person or organization that violates the False Claims Act is liable to the United States for a civil penalty for each violation, plus treble the federal government's damages. *See* 31 U.S.C. §3729(a)(1); 28 C.F.R. §85.5(a) & Table 1 (inflation-adjusted penalty amounts).

36. The statutory terms "knowing" and "knowingly" mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate

**FILED EX PARTE & UNDER SEAL**

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1). Proof of specific intent to defraud is not required. *Id.* The statutory term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." §3729(b)(4).

37. False Claims Act liability can be premised on an "implied false certification" theory. The Act "encompasses claims that make fraudulent misrepresentations, which include certain misleading omissions." *Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016). So when a defendant "makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Id.*

38. The Alliance is eligible to serve as a relator under the False Claims Act, which provides that any "person may bring a civil action for a violation of [the Act] for the person and for the United States Government." 31 U.S.C. §3730(b)(1).

39. Corporate entities like the Alliance are "presumptively covered by the term 'person'" as used in the Act. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 782 (2000) (citing 1 U.S.C. §1); *see* 1 U.S.C. §1 (the word "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). And membership organizations can and do serve as relators. *See, e.g.*, *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp*, 276 F.3d 1032, 1036 (8th Cir. 2002) ("The Association represents the certified nurse anesthetists of Minnesota.").

**FILED EX PARTE & UNDER SEAL**

40. The Alliance has complied with the Act's procedural requirements. Concurrent with filing this sealed complaint, the Alliance served a copy of the complaint and "written disclosure of substantially all material evidence and information" the Alliance possesses on the United States pursuant to Federal Rule of Civil Procedure 4(i). *See* 31 U.S.C. §3730(b)(2).

### B. The Florida False Claims Act

41. The Florida False Claims Act imposes civil liability on any person who, among other things: (1) "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval;" (2) "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;" or (3) "[c]onspires to commit a violation of [the Act]." Fla. Stat. §68.082(2)(a)-(c).

42. The statutory terms "knowing," "knowingly," and "material" in the Act have similar meanings to their federal counterparts. *Id.* §68.082(1)(c)-(d); *see, e.g.*, *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007) (explaining that because the Florida False Claims Act is modeled after its federal equivalent, the two statutes are construed in conformity).

43. A person or organization that violates the Florida False Claims Act is liable to Florida for a civil penalty for each violation, plus treble the State's damages. *See* Fla. Stat. §68.082(2).

44. The Alliance is eligible to serve as a relator under the Florida False Claims Act, which provides that any "person may bring a civil action for a violation of [the Act] for the person and for the affected agency." §68.083(2). The word "person" in the Act "includes individuals, … associations, … corporations, and all other groups or combinations." §1.01(3).

**FILED EX PARTE & UNDER SEAL**

45. The Alliance has complied with the Act's procedural requirements. Concurrent with filing this sealed complaint, the Alliance served a copy of the complaint and "written disclosure of substantially all material evidence and information" the Alliance possesses on the Florida Attorney General and the Florida Department of Financial Services by registered mail, return receipt requested. §68.083(3).

### C. The Indiana False Claims and Whistleblower Protection Acts

46. The Indiana False Claims and Whistleblower Protection Act imposes civil liability on any person who, among other things: knowingly or intentionally (1) "presents a false claim to the state for payment or approval;" (2) "makes or uses a false record or statement to obtain payment or approval of a false claim from the state;" or (3) "conspires with another person to [violate the Act]." Ind. Code §5-11-5.5-1(a); §5-11-5.5-2(b).

47. The Indiana Medicaid False Claims and Whistleblower Protection Act applies to claims relating to the State's Medicaid program and imposes civil liability on any person who, among other things: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" (2) "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim;" (3) "conspires with another person to [violate the Act];" or (4) "causes or induces another person to [violate the Act]." §5-11-5.7-1(a); §5-11-5.7-2(a).

48. Because the federal government funds state Medicaid programs, a violation of the Indiana Medicaid False Claims and Whistleblower Protection Act necessarily entails a violation of the False Claims Act. *See* 31 U.S.C. §3729(b)(2) (defining a "claim" to include "any request or demand … made to a contractor, grantee, or other recipient" if "the money or

**FILED EX PARTE & UNDER SEAL**

property is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States "provides or has provided any portion of the money or property requested or demanded").

49. A person or organization that violates either Act is liable to Indiana for a civil penalty for each violation, plus treble the State's damages. *See* Ind. Code §5-11-5.5-2(b); §5-11-5.7-2(a).

50. The Alliance is eligible to serve as a relator under the Acts, which both provide that any "person may bring a civil action for a violation of [the Acts] on behalf of the person and on behalf of the state." Ind. Code §5-11-5.5-4(a); §5-11-5.7-4(a). The word "person" in both Acts "includes a natural person, a corporation, … an association, [or] an organization." §5-11-5.5-1(5); §5-11-5.7-1(7).

51. The Alliance has complied with both Acts' procedural requirements. Concurrent with filing this sealed complaint, the Alliance served a copy of the complaint and a "written disclosure that describes all relevant material evidence and information" the Alliance possesses on the Indiana Attorney General and Inspector General. §5-11-5.5-4(c); §5-11-5.7-4(c).

## II. Deloitte's state and federal nondiscrimination obligations

52. Defendants' violations of the False Claims Act and the state equivalents stem from their systematic disregard for state and federal antidiscrimination law. Simply put, these laws make it illegal to engage in discrimination based on race. By engaging in a concerted pattern of racial discrimination, racial balancing, and racial quotas, Defendants grossly and clandestinely violated the law.

**FILED EX PARTE & UNDER SEAL**

53. Rather than own up to their illegal discrimination, Defendants concealed it from their governmental clients. That deception was for a reason. Defendants' federal contracts included a promise not to "discriminate against any employee or applicant for employment because of race [or] color." 41 C.F.R. §60-1.4(a). The same clause explained that noncompliance was grounds for the contracts to be "canceled, terminated or suspended in whole or in part" and for Defendants to be "declared ineligible for further Government contracts." *Id.* Defendants' state contracts either expressly incorporated the federal nondiscrimination clause or included a substantially similar state equivalent. Thus, if Defendants had told the truth about their rampant use of discriminatory employment practices, Deloitte's multi-billion-dollar government contracting business would have come crashing down.

### A. Title VII, Section 1981, and state antidiscrimination laws

54. Title VII makes it an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. §2000e-2(a)(1); *see also* §2000e-2(a)(2) (same for "classify[ing]" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [their] status as an employee, because of … race [or] color").

55. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). That right "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." §1981(b). Claims of race

FILED EX PARTE & UNDER SEAL

discrimination in employment "'brought pursuant to Title VII and §1981 are governed by the same evidentiary framework, such that the analyses under both statutes are substantively the same.'" *Ayorinde v. Team Indus. Servs. Inc.*, 121 F.4th 500, 506 (5th Cir. 2024) (quoting *Jackson v. Watkins*, 619 F.3d 463 (5th Cir. 2010).

56. These laws protect white employees on the same basis as employees of any other racial group. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976).

57. The Florida Civil Rights Act and Indiana Civil Rights Act contain substantially similar prohibitions. *See* Fla. Stat. §760.10(1); *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004) (Florida Civil Rights Act "patterned after" and "construed … in accordance with" Title VII); Ind. Code §22-9-1-3(l); *Smith v. Salvation Army*, 2015 WL 12556136, at *1 n.1 (N.D. Ind. Feb. 10) (similar for the Indiana Civil Rights Act).

### B. Executive Order 11246, 41 C.F.R. §60-1.4, and the Federal Acquisition Regulations

58. Since 1965, the Executive Branch has imposed broad contractual nondiscrimination obligations on firms that do business with the government. *See* Exec. Order No. 11246, 30 Fed. Reg. at 12320.

59. During the period it was in effect (all relevant dates for purposes of this action), Executive Order 11246 required that every government contract—aside from a few "[e]xempt" ones—"contain a clause under which the employer agrees not to discriminate in employment on the basis of race [or] color." *United States v. New Orleans Pub. Serv., Inc.*, 553 F.2d 459, 463 (5th Cir. 1977), *vac'd on other grounds*, 436 U.S. 942 (1978). The Order implemented this directive by instructing "all Government contracting agencies [to] include" the following clause in "every Government contract":

# FILED EX PARTE & UNDER SEAL

During the performance of this contract, the contractor agrees as follows:

> (1) The contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training …
>
> (4) The contractor will comply with all provisions of Executive Order No. 11246.

Exec. Order No. 11246; *accord* 41 C.F.R. §60-1.4(a).[2]

60. The Secretary of Labor promulgated implementing regulations requiring the inclusion of Executive Order 11246's nondiscrimination clause in all federal contracts. *See* 41 C.F.R. §60-1.4. The regulations required "each contracting agency" to include the nondiscrimination clause in "each of its Government contracts (and modifications thereof if not included in the original contract)." §60-1.4(a). Non-exempt prime contractors and subcontractors also had to include the clause in each of their subcontracts. §60-1.4(c). The regulations expressly permitted incorporation by reference and stated that a nondiscrimination clause would be incorporated in every contract "required by the order and the regulations … to include such a clause," regardless of whether it was "physically incorporated in such contracts" or whether the contract was reduced to writing. §60-1.4(d)-(e).

61. The Federal Acquisition Regulations, which govern federal procurement, also implement Executive Order 11246. *See* FAR 22.802. The FAR in effect at the time of the

[2] The Secretary of Labor can exempt some contracts from Executive Order 11246's equal-opportunity requirements. *See* Exec. Order No. 11246; 41 C.F.R. §60-1.5. On information and belief, the Secretary did not exempt any of Defendants' federal contracts. To the extent such exemptions exist, this complaint does not allege violations of the False Claims Act based on exempted contracts.

**FILED EX PARTE & UNDER SEAL**

alleged conduct required contracting officers to include an equal-opportunity clause in all non-exempt contracts. *See* FAR 22.802, 22.810. The FAR also required contractors with more than 50 employees and $50,000 in contracts to develop written plans guaranteeing nondiscrimination and created a pre-award clearance procedure for contracts over $10 million. FAR 22.804-1, 22.805.

62. Under the FAR, every non-exempt contract included a question asking contractors whether they had previously worked on an equal-opportunity contract and whether they had filed all required Executive Order 11246 compliance reports. FAR 22.810(a)(2), 52.222-22. These reports were intended to "promot[e] and insur[e]" "equal opportunity for all persons, without regard to race [or] color, … employed or seeking employment with Government contractors." 41 C.F.R. §60-1.1. Contractors were also asked to represent that they had developed an affirmative-action plan that complied with Executive Order 11246 "to ensure equal opportunity in employment." FAR 22.801, 22.804-1, 52.222-25.

63. Recently, contractors' obligation to make certain representations, including the two listed above, transitioned online to the System for Award Management, or "Sam.gov." Each year, a contractor must re-register on Sam.gov, certify that it has read each applicable FAR provision in its annual "Reps and Certs," and attest to the accuracy of those representations and certifications on pain of liability. Like all large federal contractors, Deloitte and its subsidiaries participate in this annual process.

64. Compliance with Executive Order 11246, its implementing regulations, and the FAR is more than a formality. Until recently, contractors recertified their representations about compliance reports and affirmative action plans every year to maintain access to Sam.gov (and

**FILED EX PARTE & UNDER SEAL**

thus the centralized federal procurement process). The FAR provided that "[n]o contract or modification involving new acquisition shall be entered into, and no subcontract shall be approved by a contracting officer, with a person who has been found ineligible … for reasons of noncompliance with the requirements of E.O.11246." FAR 22.802(b); *see* FAR 22.809 (enforcement). The Department of Labor's implementing regulations also contemplated a suite of enforcement mechanisms against discriminatory contractors involving the Office of Federal Contract Compliance Programs, the Solicitor of Labor, and the Attorney General. *See* 41 C.F.R. §§60-1.20, *et seq.*

## FACTS

69. Although its constituent parts operate internationally under a common brand, the entity colloquially known as "Deloitte" has a complex corporate structure. At the highest level is Deloitte Global. Deloitte Global's membership is then made up of smaller firms and subsidiaries that do business under the "Deloitte" brand in their respective jurisdictions. Member firms are primarily organized on an individual country or regional basis, and each member firm operates within the legal and regulatory framework of the jurisdiction where it is located.

70. Deloitte is the national-level member conducting operations in the United States. Those operations are divided throughout a network of smaller subsidiaries that have primary responsibility over different parts of the professional-services practice. These operating units include Deloitte Consulting, Deloitte & Touche, Deloitte Financial Advisory Services, and Deloitte Transactions and Business Analytics. Together, Deloitte and its

**FILED EX PARTE & UNDER SEAL**

subsidiaries are one of the largest professional-services firms in the country, with a substantial portion of their business arising out of state and federal government contracts.

71. Deloitte coordinates and controls its U.S. subsidiaries' activities, interfaces between those subsidiaries and Deloitte Global, and runs national programs that cut across various subsidiaries and operating units. When Deloitte creates a program that requires the action of multiple operating units or adopts a national policy or practice, its subsidiaries participate. More broadly, when Deloitte's national leadership sets the direction for the company's U.S. operations, its subsidiaries fall in line.

72. One example of Deloitte's national influence is "Deloitte University." Located in Westlake, Texas, Deloitte University is a massive campus (over 700,000 square feet) that hosts a range of career-development programs for new employees and interns across Deloitte's operating units. More senior employees also travel to the facility for conferences and tailored development opportunities around major milestones in their career. These opportunities are crucial for those participating in the competitive process to determine whether employees will be promoted and continue rising through the ranks towards senior leadership.

73. Another example is Deloitte's website, which includes a career and recruiting platform that hosts job postings from every U.S. entity operating under the "Deloitte" brand. *Careers*, Deloitte, perma.cc/C4YE-V252 (archived Apr. 15, 2025). Deloitte uses this platform as a national human-resources and recruiting clearinghouse across its operating units. This level of cross-subsidiary coordination and control is required because Deloitte has agreed to participate in a national recruitment program, the OneTen Initiative, that includes concrete

hiring commitments. To achieve Deloitte's OneTen commitments, each operating unit must work from a centralized hiring playbook that is overseen by national leadership.

## I. Defendants' government contracts prohibit unlawful racial discrimination.

74. Deloitte, through its subsidiaries, operates a multi-billion-dollar government contracting business that accounted for roughly one third of Deloitte's U.S. revenue in FY2024. Much of that money originated in contracts funded by the federal treasury. As has been the case for the last sixty years, nearly every such contract included an equal-opportunity clause promising to comply with Executive Order 11246's ban on employment discrimination.

75. Deloitte and its subsidiaries know all about Executive Order 11246, equal-opportunity clauses, and the longstanding prohibition on racial discrimination in government contracting. There's no way they couldn't, because the equal opportunity clause is incorporated by reference into many—if not all—of their federal contracts.

76. Consider a few examples. In September 2021, Deloitte Consulting contracted with the Department of Justice for more than $6 million. *Amendment of Solicitation* 1, Contract #GS00Q14OADU113, Deloitte Consulting (Nov. 10, 2021), perma.cc/Q2EQ-DFFX; *accord Contract Summary*, Deloitte Consulting, perma.cc/4ACT-4VTX (Sept. 26, 2021, through Sept. 25, 2025). DOJ's contract "incorporat[ed]" several FAR provisions "by reference," explaining that those clauses have "the same force and effect as if they were given in full text." *Amendment of Solicitation*, *supra* at 55; 41 C.F.R. §60-1.4(d) (permitting this practice). FAR 52.222-26, the equal opportunity clause, was one such provision. *Id.* at 57. Again, the equal opportunity clause required by FAR 52.222-26 bans federal contractors from "discriminat[ing] against any employee … because of race [or] color." 48 C.F.R. §52.222-26(c)(2), (c)(2). So when Deloitte

# FILED EX PARTE & UNDER SEAL

contracted with the DOJ, it agreed not to unlawfully "discriminate," §52.222-26(c)(2), or treat its employees differently based on "their race [or] color," §52.222-26(c)(2).

77. An October 2021 contract between Deloitte Consulting and the National Institutes of Health has the same requirements. *Amendment of Solicitation* 1, Contract #HHSN316201200018W, Deloitte Consulting, perma.cc/TE2H-DR99 (Oct. 21, 2021). This contract also "incorporate[d]" several FAR provisions "by reference," instructing the company that such provisions had "the same force and effect as if they were given in full text." *Id.* at 51. One of those clauses was FAR 52.222-26—the "equal opportunity" clause that stops federal contractors from discriminating. *Id.* at 52 (cleaned up).

78. A "$450,000,000" contract between Deloitte Consulting and the Department of Defense continued the trend in 2023. *Award/Contract No. W911NF24D0001* 1, Deloitte Consulting, perma.cc/VG6U-SPVH (Nov. 15, 2023). In "Section I" of the DOD's contract—in a provision titled "Clauses incorporated by reference"—the government cited the "Equal Opportunity" clause as a prerequisite for contracting. *Id.* at 31-32.

79. Deloitte's other operating units have signed similar contracts—all of which require Deloitte and its subsidiaries to comply with the equal opportunity clause's nondiscrimination requirement. In 2022, for instance, Deloitte & Touche modified a multi-million-dollar contract with the General Services Administration, which required the company to follow "52.222-26 Equal Opportunity"—the same FAR provision that Deloitte Consulting agreed to in all its contracts. *View Contract Clauses*, Contract #GS-00F-029DA, Deloitte & Touche, perma.cc/QR4N-T332 (archived Mar. 15, 2025); *Deloitte GSA Schedule* 1-3, Contract #GS-00F-029DA, Deloitte & Touche, perma.cc/74K6-BN9E (December 4, 2015, through

**FILED EX PARTE & UNDER SEAL**

December 3, 2025). And in 2024, Deloitte Financial Advisory Services modified another seven-figure contract with the same "equal opportunity" rules as all the other ones. *View Contract Clauses*, Contract #47QSMA19D08PL, Deloitte Financial Advisory Services, perma.cc/L6A6-44MM (archived Mar. 15, 2025) (cleaned up); *Deloitte Financial Advisory Services LLP—Multiple Award Schedule*, Contract #47QSMA19D08PL, Deloitte Financial Advisory Services, perma.cc/H43A-3EJ2 (Mar. 27, 2024, through Mar. 26, 2029).

80. Defendants' contracts with state governments similarly prohibit racial discrimination in employment.

81. Take Deloitte Consulting's cloud computing contract with the Florida Department of Management Services. *Participating Addendum—Cloud Solutions*, Contract #43230000-NASPO-16-ACS, Deloitte Consulting, perma.cc/J2LM-7D76 (Oct. 1, 2020, through Sept. 30, 2026). Section 5.1 of the contract, titled "Compliance with Laws: Conduct of Business," requires Deloitte Consulting to "comply with all laws, rules, codes, ordinances, and licensing requirements that are applicable to the conduct of its business, including those of federal, state, and local agencies having jurisdiction and authority." *Id.* at 6. The contract gives "all prohibitions against discrimination on the basis of race" as an example of the kind of law that a contractor must obey. *Id.*

82. The same is true for Deloitte Transactions and Business Analytics' ~$15.5 million Medicaid contract with Indiana. *Medicaid Fraud and Abuse Detection Services*, Contract #53902, Deloitte Transactions and Business Analytics, perma.cc/2HGU-R48J (July 1, 2021, through June 30, 2025). That contract includes a mandatory clause requiring that the contractor:

**FILED EX PARTE & UNDER SEAL**

> covenan[t] that it shall not discriminate against any employee or applicant for employment relating to this Contract with respect to the hire, tenure, terms, conditions or privileges of employment or any matter directly or indirectly related to employment, because of the employee's or applicant's race, color, national origin, religion, sex, age, disability, ancestry, status as a veteran, or any other characteristic protected by federal, state, or local law.

*Id.* at 17; *see also* Ind. Code §22-9-1-10.

83. The same provision requires the contractor to "certif[y] compliance with applicable federal laws, regulations, and executive orders prohibiting discrimination based on [race] in the provision of services." *Medicaid Fraud and Abuse Detection Services* at 17; *see also id.* at 2 ("The Contractor shall comply with all applicable federal, state, and local laws, rules, Regulations."); *id.* at 4 (identifying compliance as a condition of payment); *id.* at 22 ("assurance of compliance" with Title VI). And as Indiana law requires, the contract makes clear that illegal discrimination in breach of the nondiscrimination clause qualifies as "a material breach of this Contract." *Id.* at 17.

84. By this point, two things should be clear. First, Defendants' government contracts almost uniformly include an express prohibition on racial discrimination, including in employment. Second, Defendants' government clients view these nondiscrimination obligations as important contractual terms, not meaningless technicalities.

## II. Despite its legal and contractual obligations, Deloitte systematically embraces a policy of intentional racial discrimination.

85. Unfortunately, Defendants have abjectly failed to fulfill their contractual nondiscrimination obligations. Rather than upholding equal opportunity, which Deloitte and its subsidiaries profess as official policy, Defendants have embraced racial preferences at every

**FILED EX PARTE & UNDER SEAL**

level of their business. Though these preferences take many forms, they all share a common root—invidious discrimination against white male employees.

### A. Springboard

86. One of the most important moments in a career at Deloitte is the window of time when a senior manager is considered for elevation to the partnership. A positive outcome means entering a new phase of your career, potentially becoming an equity-holding owner of the firm, and earning the opportunity to start climbing a new ladder towards senior leadership. In contrast, a negative outcome can place a ceiling on your opportunity for advancement or even result in needing to leave the company. Either way, the partnership competition shapes employees' futures at Deloitte and, in the aggregate, Deloitte's future.

87. Given the weighty nature of this decision, it is no surprise that both Deloitte and its employees take the process, which lasts roughly two years and proceeds in multiple stages, very seriously. What is surprising, though, is that Deloitte gives employees of some racial groups a clear leg up in what it otherwise proclaims to be a merit-based, egalitarian competition. One key leg up is Deloitte Consulting's "Springboard" program, one of Defendants' most egregious efforts to manufacture racial "parity" by treating some employees as more equal than others.

88. Championed by leadership, Springboard is a "career experience that provides cohorts of women and racially and ethnically diverse* Senior Managers and Specialist Leaders with opportunities to bolster professional development, accelerate career trajectory to [Partner, Principal, or Managing Director], and build a strong network."

89. Springboard is intended to further racial balancing at the highest levels of Deloitte's consulting practice. They defined "racially or ethnically diverse*" to mean "Black or

# FILED EX PARTE & UNDER SEAL

African American, Hispanic/Latino, Native Hawaiian or other Pacific Islander, American Indian or Alaska Native, [and] two or more races." And they explained that Springboard was intended to "improve representation of racially and ethnically diverse* leaders at the [Partner, Principal, or Managing Director] level."

90. The following one-pager was distributed internally at Deloitte to define and build awareness about the program:




91. Springboard participants received a host of benefits that white, male participants in the partnership competition did not.

92. Each Springboard participant was assigned a "Sponsor" to "conduct 1:1 virtual check-ins" and "engage in client/project experiences, leadership exposure, and advocacy to accelerate [their] career." These sponsors included high-ranking leaders at Deloitte Consulting, even though it was a significant departure from ordinary practice for such a person to be tasked with ensuring that a single candidate succeeded during the promotion process.

# FILED EX PARTE & UNDER SEAL

93. Springboard participants had the opportunity to request a "counselor realignment," which meant that Defendants would reassign them from the coach that they (like white employees) received at random to a "leader … recognized for cultivating talent." Although white male employees could also request a new coach, giving Springboard participants preferential access to senior leaders recognized for cultivating talent as replacement coaches was a significant departure from Deloitte Consulting's ordinary practices.

94. Springboard participants received complimentary professional coaching before their entry into the partnership competition. While Defendants sometimes provided other employees with coaching after an unsuccessful cycle, Springboard participants received the benefits of coaching on the front end and were not obliged to fail before Deloitte would step in to help.

95. Springboard participants were given "individualized action plans" developed by Defendants to make sure that they understood what needed to be done to succeed in the partnership competition. Things were different for white male employees, who were required to navigate the notoriously opaque promotion process without any formal guidance on the front end.

96. Defendants worked to ensure that Springboard participants maintained "network parity" with other employees by ordering the latter to leverage their networks on behalf of the former. While some amount of leveraging a colleague's network might occur in the usual course, Defendants' practice of systematically directing white male employees to leverage their networks for minority counterparts to advance "network equity" departed from ordinary practice.

**FILED EX PARTE & UNDER SEAL**

97. Perhaps most importantly, Springboard participants were placed into the program well before their window to compete for the partnership began. Thus, participants had significantly more time to prepare than a similarly situated white male.

98. Together, these departures from ordinary practice gave "racia[l] or ethni[c]" minorities a significant and important leg up by placing them on a separate promotion track that Defendants made categorically unavailable to white male employees.

### B. Compass

99. The "Compass" program, designed to aid a less senior cohort of employees seeking promotion from manager to senior manager, was much like Springboard in discriminatory design, function, and effect.

100. To "rebalance" the ranks of Deloitte Consulting's senior manager corps, Defendants created a parallel promotion process for "racially or ethnically diverse" employees that gave participants a significant boost over their white male colleagues.

101. Defendants also automatically assigned senior managers to participate in the program, expected those senior managers to further the program's discriminatory aims, and evaluated participation in the program as a component of senior managers' own annual performance evaluations.

### C. The OneTen Initiative

102. Launched in December 2020 with Deloitte as a founding member, the OneTen Initiative was (and still is) a coalition of large firms that have committed to achieving race-based hiring and promotion outcomes.

**FILED EX PARTE & UNDER SEAL**

103. At first, OneTen's goal was to benefit, through hiring or promotion, one million black employees by 2030. By partnering with OneTen, Deloitte committed to making up a discrete chunk of those one million employment actions.

104. Although OneTen launched with a facially discriminatory objective, it was never stated in public-facing materials that members of the coalition planned to accomplish that objective by engaging in intentional discrimination against employees of other races.

105. OneTen's means and ends became even murkier in 2023, when the initiative shifted its public focus to employees without four-year degrees and dropped all explicit references to benefiting one million black employees as a racial group.

106. But even after OneTen publicly transitioned to an allegedly race-neutral goal, Deloitte understood the initiative and its OneTen commitments in starkly discriminatory terms.

107. Consider Deloitte Consulting's Government and Public Services practice. As background, the GPS practice is divided into six "offering portfolios" organized together under the banner of "offerings and solutions," which has its own partner leader who reports to the head of the GPS practice. Within offerings and solutions, each offering portfolio has a leader, and each leader has a chief of staff. Between 2023 and 2024, the leader of offerings and solutions (now leader of the entire GPS practice) would regularly meet with her offering portfolio leaders, who controlled hiring within their jurisdictions, to discuss issues that affected the entire practice.

**FILED EX PARTE & UNDER SEAL**

108. During these meetings, the Offerings and Solutions Leader would often express disappointment to her subordinates that the practice wasn't meeting the internal goals that it had set as part of Deloitte's OneTen commitment.

109. Even though OneTen was in the process of publicly transitioning to a facially race-neutral goal (benefiting employees without four-year degrees), the Offerings and Solutions Leader and her subordinates consistently used race and ethnicity. Between February and November 2023, the Offerings and Solutions Leader and the offering portfolio leaders made clear in regular meetings that they understood the purpose of Deloitte's OneTen commitments to be intentionally changing the racial composition of the company's workforce to better reflect national demographics. They also understood that finding or creating positions able to be filled without a four-year degree would not accomplish Deloitte's real goal if the employees hired or promoted looked like its existing workforce, which some offering portfolio leaders referred to as "too male and too pale."

110. From the GPS Offerings and Solutions Leader and the offering portfolio leaders to their chiefs of staff and other subordinates, the message was clear: Deloitte was on a mission to change the racial composition of its workforce, and despite its best efforts to accomplish that mission by hiring and promoting black employees without four-year degrees, the GPS offerings and solutions team was failing. Given Deloitte's record as a serial discriminator, it is no surprise that the apparent solution to this perceived problem was yet more discrimination. The GPS Offerings and Solutions Leader instructed the offering portfolio leaders to do everything they could to find or create jobs that could be filled by black employees without four-year degrees; in other words, they should discriminate against

**FILED EX PARTE & UNDER SEAL**

applicants of other races to make sure that the positions they found or created were indeed filled by black employees.

### D. Deloitte University

111. In addition to Springboard and Compass, Deloitte hosted a series of segregated summits, conferences, and other events at its Deloitte University campus in Westlake, Texas, where participation was restricted to employees of certain racial groups.

112. These fully funded events, which cut across Deloitte's various operating units, were designed to give participants access to special professional-development opportunities, introduce them to senior leaders in the firm, and prepare them to continue advancing up the corporate ladder.

113. For example, a consultant invited to Deloitte's annual "Black Leadership Summit" and identified as an "emerging black leader" would gain access to an exclusive network of high-ranking professionals committed to advancing his or her career (like the GPS Enterprise Performance Offering Portfolio Leader, who was a partial architect of the Black Leadership Summit). If that consultant later ran into trouble finding a new project or billing enough hours ("staying billable"), he could count on the Black Leadership Summit network to help make sure that he remained on the right track. White employees, who were not allowed to participate as beneficiaries and thus had to develop their networks over time and in the ordinary course of business, had no such luxury.

114. In addition to the Black Leadership Summit, Deloitte University hosted several other segregated programs limited to black employees. All these programs had the same basic purpose: ensuring that Deloitte's black employees had access to a built-in support system of senior leaders committed to seeing them climb the corporate ladder. Though any employee

**FILED EX PARTE & UNDER SEAL**

might acquire that kind of network over the years and through much effort, Deloitte sharply departed from ordinary practice to hand-deliver it to black employees identified as having leadership potential.

115. Deloitte also hosted an annual "Hispanic/Latinx Summit," as well as similar smaller events limited to Hispanic employees. Like the Black Leadership Summit, the purpose of this programming was to give Hispanic employees every possible advantage so that more Hispanics would advance through the firm's up-or-out promotion process into senior leadership positions.

116. This programming was also lucrative, including travel, food, and lodging all paid for by Deloitte. Though not advertised to the outside world, Deloitte was using Deloitte University to provide perks to employees of only certain races.

117. In contrast, Deloitte never hosted these kinds of events for its white employees. No fully funded conferences, no unique professional development opportunities, no facetime with the senior leaders who can make or break a career. In effect, Deloitte's programming created two employment tracks. One more favorable track for "disadvantaged" racial minorities, and another less favorable track for everyone else.

118. Deloitte did not decide to advantage some racial groups over others out of ignorance or incompetence. Rather, stacking the deck in favor of racial minorities was an intentional tactic to bring about racial balancing and meet racial quotas tied to national demographic statistics.

**FILED EX PARTE & UNDER SEAL**

**E. "1-to-1 Parity"**

119. Deloitte's program of intentional discrimination against white male employees was part of a larger scheme. Each of those policies and practices was simply one facet of a broader, nationwide directive referred to as "1-to-1 Parity."

120. 1-to-1 Parity sought to achieve racial parity in every observable metric at Deloitte and its subsidiaries. The problem, as Deloitte's leadership saw it, was twofold. Externally, the firm's racial demographics were different from the nation's. And internally, the demographics of high performers and senior leadership were different from the rest of the firm. Rather than carefully investigate whether these perceived disparities were the result of discrimination or some other cause, Deloitte jumped straight to reverse engineering a racial composition that leadership was more comfortable with. This overarching policy—using racial discrimination to engineer more "equitable" corporate demographics—was the heart of 1-to-1 Parity.

121. The drive to achieve 1-to-1 Parity was a foundational principle in how Deloitte's leadership managed the company and its subsidiaries. For example, Deloitte sponsored programs like Springboard and Compass with the goal of reverse engineering the racial composition of the consulting practice to achieve racial parity.

122. A level down the leadership hierarchy, the GPS Offerings and Solutions Leader and GPS Chief Talent Officer inculcated 1-to-1 Parity as the GPS practice's foundational principle.

123. In turn, their subordinates, people like the Enterprise Performance Offering Portfolio Leader and Enterprise Performance Offering Portfolio Chief Operating Officer, operationalized 1-to-1 Parity within specific offering portfolios.

**FILED EX PARTE & UNDER SEAL**

124. For example, on September 8, 2023, the Enterprise Performance Offering Portfolio Leader presented the offering portfolio's policies and goals for FY2024. The highest-ranked goal below surpassing $1 billion in sales was "[a]chieving 1-to-1 parity between the representation of the practice and available practitioners." In other words, one of his highest priorities was for the racial demographics of the offering portfolio's "bench" (those consultants not currently billable and whose careers were thus in serious jeopardy) to match the racial demographics of the practice as a whole.




125. Usage rates or "utilization" is a key factor of individual performance and a determinate of compensation and promotion. Because usage rates within a practice or offering portfolio are zero sum, targeting 1-to-1 parity meant discriminating against high-performing consultants whose racial groups were "overrepresented" and in favor of low-performing consultants whose racial groups were "underrepresented."

# FILED EX PARTE & UNDER SEAL

126. The implementation of 1-to-1 Parity in the Enterprise Performance Offering Portfolio extended beyond usage rates. For example, the Enterprise Performance Offering Portfolio Leader sought to achieve racial parity in senior leadership positions within his offering portfolio. And when a subordinate presented him with a race-neutral slate of nominees for an important award from leaders within the offering portfolio, he rejected the slate and instructed that it be revised to reflect a greater percentage of women and racial minorities.

## F. Leadership's knowledge of the illegality of 1-to-1 Parity

127. Leaders at Deloitte understood that this approach violated state and federal antidiscrimination law.

128. In November 2024, the GPS Chief Talent Officer admitted to a colleague that Deloitte had "gone a little crazy with DE&I" starting in 2020. Now, he explained, the company was in the process of "rolling it back."

129. In another conversation about the implementation of 1-to-1 Parity in the Enterprise Performance Offering Portfolio, the portfolio's Chief Operating Officer described the directive as "the intentional targeting of gender and color other than white" and "the opposite" of remedying illegal discrimination against racial minorities.

130. The Chief Operating Officer admitted that the "intentional targeting of gender and race for some of these awards or positions or what have you" could feel "weird" and suggested the practice functioned as a kind of "reverse quota" "targeting everyone but white males." He also described Deloitte's practices as a policy of "if these two candidates are equal, then being intentional about picking the person of color."

**FILED EX PARTE & UNDER SEAL**

131. The Chief Operating Officer defended 1-to-1 Parity by arguing that everyone was doing it—"it" being "intentionally targeting" and "over vectoring, you know, to be able to pull in greater representation." He argued that "if you don't do it intentional, you'll never get there and nothing will ever change."

132. The Chief Operating Officer conceded that "do[ing] it intentional" meant that there would be "a population of people … who are now then being, um, I don't want to, it's a strong word to say being discriminated against, who are being, you know, affected by it." But because he didn't see "a path through it that doesn't cause somebody to be upset," he recommended not reporting the discrimination—even though not reporting contradicted Deloitte's own internal policies.

133. In a statement that was "off the record, [be]cause again, of the sensitivity," the Chief Operating Officer explained that workplace discrimination against white males was a "tough" issue. The issue was difficult because "I don't know how you increase diversity and equity if we aren't intentional about it and we aren't, we aren't, like specifically trying to do the kinds of things that like [the Enterprise Performance Offering Portfolio Leader] is referencing and frankly every leader [at Deloitte] is referencing, and leaders outside of Deloitte." The kinds of things the Enterprise Performance Offering Portfolio Leader had been referencing, of course, were strict racial quotas. But in the Chief Operating Officer's view, such extreme measures were "just trying to increase that, you know, people who've been underrepresented."

134. The Chief Operating Officer compared 1-to-1 Parity to "equity programs" in college admissions before belatedly acknowledging that *Harvard* had held that those programs were illegal.

# FILED EX PARTE & UNDER SEAL

135. He then sought to justify 1-to-1 Parity by blaming its victims, explaining that because white males "have such a blind spot for the advantages that we've had to get to where we are today" "now there's some … intentional efforts to kind of like, to create a diversity at these levels." Thus, he concluded, white males should "just kind of accept this" as a "correction" to the status quo.

136. The Chief Operating Officer summarized his views as follows: "I don't know how you do it if you don't [do it] intentional, if you're not intentional about it. And then, if you're intentional about it then, you know, you're intentionally not selecting other populations."

## G. 1-to-1 Parity created a de facto racial quota system

137. The GPS Offerings and Solutions Leader's and the Enterprise Performance Offering Portfolio Leader's implementation of 1-to-1 Parity in Deloitte Consulting's GPS practice reveals that the directive acted as a system of racial quotas that governed every aspect of the practice from hiring to awards to promotions to assignments. And the GPS Chief Talent Officer's and the Enterprise Performance Offering Portfolio Chief Operating Officer's comments demonstrate that, although Deloitte Consulting offers an especially striking example, substantially similar policies have been implemented throughout Deloitte's operating units since at least 2020.

138. Taken together, these facts establish that Deloitte's leadership understood 1-to-1 Parity's purpose (racial balancing); its methods (race-based hiring, racial quotas for usage rates and awards, segregated professional development programs, and a parallel promotion process limited to racial minorities); and its inevitable effect (intentional racial discrimination against white males).

# FILED EX PARTE & UNDER SEAL

139. Such practices violate Title VII, Section 1981, and equivalent state and federal antidiscrimination laws—badly. *See, e.g.*, *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) ("Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" (quoting 42 U.S.C. §2000e–2(a)(1))); *id.* (explaining that "the statute targets practices that treat a person worse because of … [a] protected trait" like their race or ethnicity (cleaned up)). And they always have.

## COUNT I
## False Claims Act
## 31 U.S.C. §§3729, *et seq.*
## (Against All Defendants)

140. The Alliance repeats and realleges each of its prior allegations.

141. Defendants violated the False Claims Act in at least three respects.

142. First, Defendants knowingly submitted false and fraudulent claims for payment on billions of dollars in federal contracts during the limitation period. 31 U.S.C. §3729(a)(1)(A). Defendants' claims for payment on these contracts identified the specific goods or services provided. And their contracts incorporated (directly, by reference, or as a matter of law) nondiscrimination clauses requiring that Defendants guarantee equal opportunity in employment. They also incorporated Defendants' annual "Reps and Certs," including representations that Defendants had previously worked on equal opportunity contracts, filed all required equal-opportunity compliance reports, and adopted an affirmative-action plan that complied with Executive Order 11246, section 1981, and Title VII.

**FILED EX PARTE & UNDER SEAL**

143. Given these representations about compliance with various elements of Executive Order 11246's comprehensive nondiscrimination regime, the knowing failure to disclose a systematic program of intentional racial discrimination rendered Defendants' claims for payment "misleading half-truths," at the very least. *Escobar*, 579 U.S. at 190. And those misleading representations were material to the government's decision to pay. If Defendants had presented themselves in public as the serial discriminators that they admitted to being behind closed doors, the government never would have contracted with them in the first place, much less made good on their claims for payment after the fact. As a professional service, Deloitte's employees are the key feature of the services that the government acquired. How those people are recruited and retained has a direct and material impact on the procurement and the performance of the service.

144. Second, Deloitte created a document titled "Affirmative Action Plan for Equal Employment Opportunity," which was signed by the CEO each year. The policy outlined Defendants' claimed commitment to nondiscrimination:

> Deloitte's policy is to seek and employ people with skill and integrity and to provide them with the means to develop professionally, without regard to race, color, religion, creed, citizenship, national origin, age, sex, gender, pregnancy, gender identity/expression, sexual orientation, marital status, disability (including neurodiversity), genetic information, veteran status or any other legally protected basis, in accordance with applicable federal, state, or local law.

It also acknowledged that federal law "requires that Deloitte prepare affirmative action plans and update them annually" and represented that Deloitte's affirmative-action plans "incorporate[d] the policies referenced herein." *Id.*

**FILED EX PARTE & UNDER SEAL**

145. Each of Deloitte's CEOs during the period at issue would have signed or ratified a similar statement of policy. Deloitte's subsidiaries either incorporated these policies as their own or drafted substantially similar policies that followed Deloitte's lead.

146. Defendants' statement that their policy was to "provide [employees] with the means to develop professionally, without regard to race [or] color," was a bold-faced lie. Although Defendants professed in public to be equal-opportunity employers, their actions in private were intentionally discriminatory. Defendants' false statements of policy, as incorporated into their Executive Order 11246 affirmative-action plans, their annual "Reps and Certs," and their many federal contracts containing an equal opportunity clause, were material to their false and fraudulent claims for payment on federal contracts. If Defendants had told the truth—that they often discriminated against employees based on race to try to achieve "1-to-1" racial "parity"—they would not have been selected to perform any federal contracting work, much less billions of dollars of it. Deloitte's creation of a false and fraudulent affirmative action plan violated the False Claims Act. 31 U.S.C. §3729(a)(1)(B).

147. Third, to the extent Defendants claim that Deloitte and its subsidiaries are legally distinct, independent entities, those entities conspired to commit the violations discussed above. *Id.* §3729(a)(1)(C). Defendants agreed to pursue the nationwide discriminatory policies and practices that rendered their statements false and to conceal their flagrant violations of the law by publicly asserting that they were equal opportunity employers. Defendants effected this conspiracy by producing false and fraudulent equal opportunity statements of policy, incorporating those false policies into their affirmative-action plans, and annually certifying that they maintained affirmative-action plans that complied with Executive

**FILED EX PARTE & UNDER SEAL**

Order 11246's nondiscrimination obligation. As described above, these false statements materially contributed to the government's payment of billions of dollars in claims arising out of Defendants' federal government contracting business.

## COUNT II
## Florida False Claims Act
## Fla. Stat. §§ 68.081, et seq.
## (Against Deloitte LLP and Deloitte Consulting LLP)

148. The Alliance repeats and realleges each of its prior allegations.

149. Defendants violated the Florida False Claims Act for substantially the same reasons they violated the federal equivalent. At a minimum, these violations arise out of a multimillion-dollar cloud computing contract with the Florida Department of Management Services. *Participating Addendum—Cloud Solutions.*

150. First, Defendants knowingly submitted millions of dollars in false and fraudulent claims for payment. Fla. Stat. §68.082(2)(a). Defendants' contract required them to comply with all federal laws "applicable to the conduct of [their] business" and specifically called out "prohibitions against discrimination on the basis of race." But despite including specific details of the cloud computing services rendered, Defendants failed to note in their claims for payment that they were also serial discriminators. If Defendants had told the truth, the Department of Management Services would have refused to pay. Not only that, but the Department would have investigated Defendants to determine whether they should have been placed on Florida's discriminatory vendors list and "disqualified from the public contracting and purchasing process." §287.134(3)(c); *see* §287.134(3)(d)(1) (providing that the Department "shall investigate" "[u]pon receiving reasonable information from any source that an entity has discriminated").

# FILED EX PARTE & UNDER SEAL

151. Second, Defendants created affirmative-action plans and policies that falsely and fraudulently misrepresented their status as equal opportunity employers. §68.082(2)(b). Those false statements were material to Defendants' false claims for payment because they affirmed that Defendants were complying with their contractual obligation not to violate state and federal "prohibitions against discrimination on the basis of race." Again, if Defendants had told the truth about their wide-ranging discriminatory employment practices, there would have been no question that they were ineligible to serve as state contractors. *See* §287.134(3)(c); §287.134(3)(d)1.

152. Third, to the extent Defendants claim that Deloitte and Deloitte Consulting are legally distinct, independent entities, those entities conspired to commit the violations of the Florida False Claims Act discussed above. Fla. Stat. §68.082(2)(c). Defendants agreed to pursue the discriminatory policies and practices that rendered their statements false and to conceal their flagrant violations of the law by publicly asserting that they were equal opportunity employers. Defendants effected this conspiracy by producing false and fraudulent equal opportunity statements of policy, incorporating those false policies into their affirmative-action plans, and omitting the details of their discriminatory employment policies. As described above, these false statements materially contributed to Florida's payment of millions of dollars in claims arising out of Defendants' state contracting business.

## COUNT III
## Indiana False Claims and Whistleblower Protection Act
## Ind. Code §§5-11-5.5-1, et seq.
## (Against All Defendants)

153. The Alliance repeats and realleges each of its prior allegations.

# FILED EX PARTE & UNDER SEAL

154. Defendants violated the Indiana False Claims and Whistleblower Act. Ind. Code §5-11-5.5-1, *et seq*. These violations arise out of various contracts with the State of Indiana. *See, e.g.*, *INvest Child Support System*, Contract #40795, Deloitte Consulting, perma.cc/J974-Y7L3 (May 4, 2020, through May 3, 2023) (~$42 million contract to develop part of the state's child support system); *Cyber Risk Assessment and Fraud Assessment*, Contract #46222, Deloitte & Touche, perma.cc/QU3W-3JRX (Nov. 1, 2020 through Apr. 30, 2021) (~$315,000 contract with Deloitte & Touche to conduct cyber and fraud risk assessments).

155. First, Defendants knowingly submitted false and fraudulent claims for payment on tens of millions of dollars in state contracts. Ind. Code §5-11-5.5-2(b)(1). As required by Indiana law, each of Defendants' contracts included a nondiscrimination clause requiring equal opportunity in employment. *See* §22-9-1-10; *e.g.*, *INvest Child Support System* at 19-20. Despite including specific details of the various services rendered, Defendants did not mention that they were engaged in a systematic program of patently illegal racial discrimination. And Defendants' failure to explain that they were violating the mandatory nondiscrimination clause was material on the clause's own terms. *See, e.g.*, *INvest Child Support System* at 19-20 (explaining that violating the nondiscrimination clause qualified as a material breach). If Defendants had told the truth about their discriminatory employment practices, the State never would have paid.

156. Second, Defendants created false affirmative-action plans and policies that fraudulently misrepresented their status as equal opportunity employers. Ind. Code §5-11-5.5-2(b)(2). Those false statements were material to Defendants' false claims for payment because they affirmed that Defendants were complying with their contractual nondiscrimination

# FILED EX PARTE & UNDER SEAL

obligations. Again, if Defendants hadn't lied about their wide-ranging discriminatory hiring practices and backed those lies up with a series of false documents, they would not have been selected to receive tens of millions of dollars in government contracts.

157. Third, to the extent that Deloitte claims that Defendants are legally distinct, independent entities, those entities conspired to commit the violations of the Indiana False Claims and Whistleblower Act discussed above. Ind. Code. §5-11-5.5-2(b)(7). Defendants agreed to pursue the discriminatory policies and practices that rendered their statements false and to conceal their flagrant violations of the law by publicly asserting that they were equal opportunity employers. Defendants effected this conspiracy by signing false and fraudulent equal opportunity statements of policy, incorporating those false policies into their affirmative-action plans, and omitting the details of their discriminatory employment practices. As described above, these false statements materially contributed to Indiana's payment of tens of millions of dollars in claims arising out of Defendants' state government contracting business.

## COUNT IV
## Indiana Medicaid False Claims and Whistleblower Protection Act
## Ind. Code §§5-11-5.7-1, et seq.
## (Against All Defendants)

158. The Alliance repeats and realleges each of its prior allegations.

159. Defendants violated the Indiana Medicaid False Claims and Whistleblower Protection Act. Ind. Code §5-11-5.7-1, *et seq.* These violations arise out of a series of multi-million-dollar contracts to provide professional services to the State's Medicaid system. *See Medicaid Fraud and Abuse Detection Services*, Contract #53902, Deloitte Transactions and Business Analytics, perma.cc/2HGU-R48J (July 1, 2021, through June 30, 2025); *Indiana Eligibility Determination Services System*, Contract #74714, Deloitte Consulting, perma.cc/G7G5-VPNX

(Jan. 1, 2023, through June 30, 2026) (~$60 million contract to determine eligibility for state Medicaid program).

160. Because the Indiana Medicaid False Claims and Whistleblower Protection Act tracks the language of its federal equivalent, Defendants' violations are substantially similar to the violations of the federal False Claims Act outlined above.

## PRAYER FOR RELIEF [JURY TRIAL DEMANDED]

161. The Alliance respectfully asks this Court to enter judgment in its favor and against Defendants and to grant the following relief:

A. A declaratory judgment that Defendants' actions violated the federal False Claims Act and the equivalent laws of Florida and Indiana.

B. Damages under the federal False Claims Act in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $13,946 and not more than $27,894 (or such amounts as the Department of Commerce shall set by rule pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (Pub. L. 101-410; 28 U.S.C. §2461), as amended by the Debt Collection Improvement Act of 1996 (Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Pub. L. 114-74, §701)) for each violation of 31 U.S.C. §§3729-3733.

C. Damages under the Florida False Claims Act in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Florida False Claims Act, Fla. Stat. §§68.081, *et seq*.

D. Damages under the Indiana False Claims and Whistleblower Protection Act in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty for the maximum amount allowed by statute, for each violation of the Indiana False Claims and Whistleblower Protection Act, Ind. Code §§5-11-5.5-1, *et seq*.

E. Damages under the Indiana Medicaid False Claims and Whistleblower Protection Act in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil

# FILED EX PARTE & UNDER SEAL

penalty for the maximum amount allowed by statute, for each violation of the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§5-11-5.7-1, *et seq.*

F. A relator's award of the maximum amount allowed pursuant to 31 U.S.C. §3730(d), and the relevant provisions of Florida's and Indiana's false claims acts.

G. A relator's award of all costs of this action and reasonable attorneys' fees under 31 U.S.C. §3730(d) and the relevant provisions of Florida's and Indiana's false claims acts.

H. All other appropriate relief.

# FILED EX PARTE & UNDER SEAL

Dated: August 14, 2026

Respectfully submitted,

*/s/ Steven C. Begakis*
Thomas R. McCarthy**
(VA Bar No. 47154)
Cameron T. Norris**
(TN Bar No. 33467)
Steven C. Begakis***
(ND Tex. No. 95172VA)
Zachary P. Grouev*
(FL Bar No. 1038629)
R. Gabriel Anderson***
(TX Bar No. 2412930)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
zach@consovoymccarthy.com
steven@consovoymccarthy.com

*admitted *pro hac vice*
**member of the Northern District of Texas
***member of the Northern District of Texas who resides in Dallas/Fort Worth